## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

LINN BLANCETT, et al.,

    Plaintiffs,

       v.

UNITED STATES BUREAU OF LAND
MANAGEMENT, et al.,

    Defendants.

Civil Action No.  04-2152 (JDB)

## MEMORANDUM OPINION

Plaintiffs, owners of a New Mexico cattle ranch with grazing rights on federal lands, bring this action against the Bureau of Land Management ("BLM") and several of its management officials pursuant to the Administrative Procedure Act, 5 U.S.C. § 706, alleging that BLM has failed to comply with mandatory duties under the Taylor Grazing Act and BLM regulations implementing the Mineral Leasing Act by not taking enforcement action against oil and gas operators and pipeline companies who have violated BLM regulations.  The federal defendants and defendant-intervenor New Mexico Oil and Gas Association (collectively, "defendants") move for judgment on the pleadings or, in the alternative, for summary judgment, on the ground that the Court lacks subject matter jurisdiction because the APA does not authorize judicial review of the alleged failures to act.  The Court held a hearing on the motions on October 28, 2005.  For the reasons explained below, the Court grants defendants' motions for judgment on the pleadings.

# BACKGROUND

## I.      Statutory and Regulatory Background

### A.      Taylor Grazing Act

The Taylor Grazing Act of 1934 delegates to the Interior Department the "enormous administrative task" of determining the bounds of the public range and creating and regulating grazing districts, which even today encompass millions of acres still being actively grazed.  See Public Lands Council v. Babbitt, 529 U.S. 728, 734, 737 (2000).  Enacted in response to problems created by population growth, forage competition among cattle, and inadequate range control, the Act set as specific goals "to 'stop injury' to the lands from 'overgrazing and soil deterioration,' to 'provide for their use, improvement and development,' and 'to stabilize the livestock industry dependent on the public range.'"  Id. at 734 (quoting 48 Stat. 1269).

The Act authorizes the Secretary "to issue or cause to be issued permits to graze livestock," and further provides that "[s]o far as consistent with the purposes and provisions of this subchapter, grazing privileges recognized and acknowledged shall be adequately safeguarded, but the creation of a grazing district or the issuance of a permit . . . shall not create any right, title, interest, or estate in or to the lands."  43 U.S.C. § 315b.  At the same time, the Act protects other competing interests.  For example, it provides that "nothing contained in this subchapter shall restrict prospecting, locating, developing, mining, entering, leasing, or patenting the mineral resources of such districts under law applicable thereto."  43 U.S.C. § 315e.  Under this provision, the BLM must not only consider mineral interests, but must give them priority over grazing privileges.  See Hinton v. Udall, 364 F.2d 676, 678-79 (D.C. Cir. 1966) (noting that the interests

of Taylor Grazing Act permit holders "were expressly made subordinate to mineral interests by Section 6 of the Taylor Act, 43 U.S.C. § 315e").

**B.     Mineral Leasing Act**

In 1920, Congress enacted the Mineral Leasing Act, 41 Stat. 437, as amended, 30 U.S.C. §§ 181 et seq., to regulate the disposition of mineral resources on lands in the public domain.  See generally Andrus v. Shell Oil Co., 446 U.S. 657, 658-59 (1980).  The Act provides for leasing of mineral rights, with title to the lands to remain in the federal government, subject to a savings clause for rights that had accrued under preexisting law.  Id. (citing 30 U.S.C. § 193).  The Act authorizes the Secretary to "prescribe necessary and proper rules and regulations and to do any and all things necessary to carry out and accomplish the purposes of this chapter."  30 U.S.C. § 189.  Pursuant to this authority, the Secretary has promulgated regulations codified at 43 C.F.R. Part 3160 on Onshore Oil and Gas Operations, with the objective of "promot[ing] the orderly and efficient exploration, development and production of oil and gas."  43 C.F.R. § 3160.0-4.  Part 3160, among other things, contains detailed provisions addressing the jurisdiction and responsibility of the agency (Subpart 3161), requirements applicable to operating rights owners and operators (Subpart 3162), and noncompliance (Subpart 3163).

**C.     Federal Land Policy and Management Act**

BLM's management of public lands is also governed by the Federal Land Policy and Management Act of 1976, 43 U.S.C. §§ 1701 et seq. ("FLPMA"), which provides that BLM "shall manage the public lands under principles of multiple use and sustained yield, in accordance with the land use plans" developed by the agency.  43 U.S.C. § 1732(a).  As the Supreme Court has noted, "'multiple use management' is a deceptively simple term that describes the enormously

complicated task of striking a balance among the many competing uses to which land can be put,

'including, but not limited to, recreation, range, timber, minerals, watershed, wildlife and fish, and

[uses serving] natural scenic, scientific and historical values.'" Norton v. Southern Utah

Wilderness Alliance, 542 U.S. 55, 58 (2004) (quoting 43 U.S.C. § 1702(c)). The principle of

"sustained yield" refers to sustaining "a high-level annual or regular periodic output of the various

renewable resources of the public lands consistent with multiple use." 42 U.S.C. § 1702(h).

Nothing in FLPMA repeals existing law by implication. Pub. L. 94-579, § 701(f), 90 Stat. 2743,

2786 (1976).

## II.     Factual Background

Although the completeness of the administrative record remains in dispute, the Court has

determined that this matter is ripe for resolution. The facts relevant to resolution of the motion

are not in dispute and, and to the extent gaps exist, the Court will construe the factual allegations

of the complaint in the light most favorable to plaintiffs. Plaintiffs Linn and Treciafaye Blancett

have rights to graze cattle on a 32,000 acre ranch located in San Juan County, New Mexico,

consisting of 86 percent federal land, 10 percent state land, and 4 percent private land.[1]  Compl.

---

[1] The complaint refers to plaintiffs as "owners" of the ranch, although other portions of the complaint and briefs indicate that title to the lands is more complex than that. See Compl. ¶ 1(referring to the ranch as a "federal lands" ranch consisting of "'base property,' water rights, mineral rights, right-of-way and easements, a [BLM] livestock grazing allotment and other property located in San Juan County"); Defs. Mem. at 8 n.2 (describing apportionment of grazing rights under the Taylor Grazing Act); see also Public Lands Council, 529 U.S. at 734-35 (explaining that preference is given to owners of "base property," that is, those who possessed rights in private lands or water sufficient to support their herds and who had grazed the public range during the five years preceding enactment of the Taylor Grazing Act). The Court will presume for purposes of resolving the pending motions that plaintiffs have the legal right to graze on the land at issue, whether characterized as ownership or rights under federal law.

¶ 13.  The Blancett family has ranched the area since 1881, and leased their grazing allotment from the BLM since the early 1930s.  <u>Id.</u> ¶ 14.

Since granting the Blancett family this allotment, BLM has leased more than 400 well sites on the same allotment to oil and gas operators and pipeline companies (collectively, "oil and gas operators"), but has failed to require those companies to comply with BLM regulations that provide for protection of the environment.  <u>Id.</u> ¶¶ 15-17.  As alleged by plaintiffs, BLM's failure to enforce the regulations has resulted in the following types of violations:

A.  Improperly constructed reserve pits, overflow pits, and drip/condensate tanks allowing leaks and contaminations;

B.  Oil, gas and pipeline sites with trash and debris present;

C.  Equipment on oil, gas and pipeline sites not painted to blend with the environment;

D.  Oil, gas and pipeline sites not properly fenced;

E.  Tanks not properly covered;

F.  Compressors and wellheads have leaks;

G.  Oil, gas and pipelines sites that produce excessive noise;

H.  Oil, gas and pipeline sites that are not properly restored and seeded;

I.  Oil, gas and pipeline sites that contain noxious weeds;

J.  Roads, ditches, pipelines and right-of-ways that are not properly constructed, reseeded and maintained.

<u>Id.</u> ¶17. Many of these violations have resulted in continuing and significant harm to the environment, including the surface of BLM lands and private lands.  <u>Id.</u> ¶ 18.  Plaintiffs have been forced to sell all but 15 of their cattle because of loss of feed due to drill sites, pipeline and road construction, contaminate spills, water pollution, and harassment of livestock, and have

effectively been forced out of the ranching business.[2]  Id. ¶ 19.  Plaintiffs allege that these failures

are unlawful, "in violation of § 706 of the APA."[3]  Compl. ¶¶ 22, 38, 43.  They seek a declaration

that the defendants "failed to adequately safeguard the Plaintiffs' grazing allotment as mandated

by the Taylor Grazing Act" and "failed to require that oil, gas and pipeline operators comply with

the BLM's regulations," in violation of the APA; they also seek orders "requiring the BLM to

comply with the Taylor Grazing Act by adequately safeguarding the Plaintiffs' allotment," to

force operators "to comply with the BLM's regulations," and to "take action against such violators

as provided by statute and regulation."  Compl. ¶ 45.

## STANDARD OF REVIEW

Because defendants' motion is based on lack of subject matter jurisdiction, the Court treats

it as a motion for judgment on the pleadings rather than one for summary judgment.  See Kirkham

v. Société Air France, 429 F.3d 288, 291 (D.C. Cir. 2005).  A motion for judgment on the

pleadings may raise Rule 12(b) defenses after the close of the pleadings, in which case courts

apply the same standard applicable to the corresponding Rule 12(b) motion – here, Rule 12 (b)(1).

See Lenox Hill Hosp. v. Shalala, 131 F. Supp. 2d 136, 140 n.4 (D.D.C. 2000).

----

[2]  Defendants' opening brief suggests that a drought was the cause of the decline in plaintiffs' ranching business, but they later concede that whether or not a drought was a contributing factor is not a material fact.  See Fed. Defs. Reply Mem. at 2-3.  The Court agrees, and will presume for the purpose of resolving the present motion that the alleged lack of enforcement action for the violations was the primary cause of the decline.

[3]  Although the complaint alleges that BLM's actions are "arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law," quoting § 706(2) of the APA, it is clear from the face of the complaint and the briefing that plaintiffs do not challenge a decision issued by the agency, but rather a failure to act governed by § 706(1), which authorizes a court to "compel agency action unlawfully withheld or unreasonably delayed."  Plaintiffs emphasized this point at the motions hearing.  See Unofficial Tr. at 39 ("Here we have a failure to act . . . . Here we have the BLM not doing anything.").  Therefore, the Court will treat this case as an action seeking relief pursuant to § 706(1), as plaintiffs have done.

The plaintiff bears the burden of establishing that the court has subject matter jurisdiction. Grand Lodge of Fraternal Order of Police v. Ashcroft, 185 F. Supp. 2d 9, 13 (D.D.C. 2001) (a court has an "affirmative obligation to ensure that it is acting within the scope of its jurisdictional authority"); see also Pitney Bowes, Inc. v. United States Postal Serv., 27 F. Supp. 2d 15, 18 (D.D.C. 1998). A court must accept as true all the factual allegations contained in the complaint when reviewing a motion to dismiss for lack of jurisdiction, and the plaintiff should receive the benefit of all favorable inferences that can be drawn from the alleged facts. See Leatherman v. Tarrant Cty. Narcotics Intelligence & Coordination Unit, 507 U.S. 163, 164, (1993); EEOC v. St. Francis Xavier Parochial Sch., 117 F.3d 621, 624-25 n. 3 (D.C. Cir. 1997). However, "the court need not accept inferences drawn by plaintiffs if such inferences are unsupported by the facts set out in the complaint. Nor must the court accept legal conclusions cast in the form of factual allegations." Kowal v. MCI Commun. Corp., 16 F.3d 1271, 1276 (D.C. Cir. 1994). Furthermore, "'plaintiff[s'] factual allegations in the complaint . . . will bear closer scrutiny in resolving a 12(b)(1) motion' than in resolving a 12(b)(6) motion for failure to state a claim." Grand Lodge, 185 F. Supp. 2d at 13-14 (quoting 5A CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1350).[4] A motion to dismiss for lack of subject matter jurisdiction may be granted "only if it appears beyond doubt that the plaintiff can prove no

---

[4] A court may consider material other than the allegations of the complaint in determining whether it has jurisdiction to hear the case. See Jerome Stevens Pharmaceuticals, Inc. v. FDA, 402 F.3d 1249, 1253-54 (D.C. Cir. 2005); Coalition for Underground Expansion v. Mineta, 333 F.3d 193, 198 (D.C. Cir. 2003); St. Francis Xavier Parochial Sch., 117 F.3d at 624-25 n. 3. Here, however, the Court finds no need to review extra-pleading materials to resolve the pending motions.

set of facts in support of his claim which would entitle him to relief." Loughlin v. United States, 393 F.3d 155, 162 (D.C. Cir. 2004) (citations omitted).

## DISCUSSION

Defendants move for judgment on the pleadings on the ground that judicial review of the alleged BLM failures to act is not authorized by the APA.  Defendants contend that, as clarified in Norton v. Southern Utah Wilderness Alliance, 542 U.S. 55 (2004) ("SUWA"), an action to "compel agency action unlawfully withheld" under § 706(1) of the APA is authorized only if two prerequisistes are satisfied:  first, the plaintiff identifies an agency failure to take a "discrete agency action," and second, such action is one the agency is "legally required" to take.  Defendants contend that both of these elements are lacking here.  Plaintiffs respond that they have satisfied these requirements, first, by alleging several ways in which defendants have failed to require compliance from operators on plaintiffs' allotment, and second, by identifying provisions of the Taylor Grazing Act and Mineral Leasing Act regulations imposing certain mandatory duties on BLM.

**A.      Judicial Review of Agency Failure to Act --The SUWA Framework**

As a threshold matter, the Court notes that defendants frame their argument in support of dismissal under § 701(a)(2), which precludes judicial review where "agency action is committed to agency discretion by law."  However, the argument is more appropriately analyzed by reference to whether the alleged failures to act are encompassed within the definition of a judicially reviewable "agency action" under the APA -- the framework of analysis applied by the Supreme Court in SUWA.

As the Supreme Court explained, the APA provisions outlining the availability of judicial review -- §§ 702, 704, and 706(1) -- "all insist upon an 'agency action' either as the action complained of (in §§ 702 and 704) or as the action to be compelled (in § 706(1))." SUWA, 542 U.S. at 62.  Section 702 of the APA authorizes judicial review of agency action upon "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute."  Section 704 further identifies "[a]ctions [r]eviewable" as "[a]gency action made reviewable by statute and final agency action for which there is no adequate remedy in a court."  Section 706(1) authorizes a court to "compel agency action unlawfully withheld or unreasonably delayed" in the case of an agency failure to act.

The Supreme Court in SUWA found significant that the term "agency action," although including "a failure to act," is defined in the first instance by reference to "a list of five categories of decisions made or outcomes implemented by an agency -- 'agency rule, order, license, sanction [or] relief.'"  Id. at 62 (quoting § 551(13)).  The Court explained that:

> All of those categories involve circumscribed, discrete agency actions, as their definitions make clear: "an agency statement of . . . future effect designed to implement, interpret, or prescribe law or policy" (rule); a "final disposition . . . in a matter other than rule making" (order); a "permit . . . or other form of permission" (license); a "prohibition . . . or taking [of] other compulsory or restrictive action" (sanction); or a "grant of money, assistance, license, authority," etc., or "taking of other action on the application or petition of, and beneficial to, a person" (relief).

Id. (quoting 5 U.S.C. §§ 551(4), (6), (8), (10), (11)) (emphasis added).  The Court then construed the phrase "failure to act" as a failure to take one of the five agency actions earlier defined in § 551(13), emphasizing that "[t]he important point is that a 'failure to act' is properly understood to be limited, as are the other items in § 551(13), to a discrete action."  Id. at 62-63 (emphasis in original).

The Court in <u>SUWA</u> also observed that the agency action sought to be compelled must be one that the agency is "legally required" to take -- a limitation reflected in § 706(1) authorizing courts to "compel agency action unlawfully withheld." <u>Id.</u> at 63.  The Court explained that this limitation was carried forward from the use of writs of mandamus under the All Writs Act, 28 U.S.C. § 1651, prior to the passage of the APA, and that the "mandamus remedy was normally limited to enforcement of 'a specific, unequivocal command,' the ordering of a 'precise, definite act . . . about which [an official] had no discretion whatever.'" <u>Id.</u> (citations omitted).

The Supreme Court concluded that the plaintiffs before it failed to satisfy either requirement.  There, plaintiffs claimed that BLM had violated a statutory mandate providing that the agency "shall continue to manage [wilderness study areas] . . . in a manner so as not to impair the suitability of such areas for preservation as wilderness" by permitting off-road vehicle use on certain public lands  <u>Id.</u> 65 (quoting 43 U.S.C. § 1782(c)).  As to the "discrete agency action" requirement, the Court held that the plaintiffs' request for entry of "a general order compelling compliance with [a statutory] mandate, without suggesting any particular manner of compliance," failed, emphasizing that "[g]eneral deficiencies in compliance . . . lack the specificity requisite for agency action." <u>Id.</u> at 66.  As to the "required to take" component, the Court found insufficient the statutory nonimpairment objective because it left the agency "a great deal of discretion in deciding <u>how</u> to achieve it." <u>Id.</u> at 66 (emphasis added).  The reviewability of plaintiffs' claims in this matter must be determined based on these requirements.

**B.**     **Discrete Agency Action**

Plaintiffs allege two claims based on the same operative set of facts -- that is, that BLM's failure to take enforcement action against oil and gas operators who violate BLM regulations,

leases or other applicable requirements violates both the Taylor Grazing Act mandate to

"adequately safeguard" plaintiffs' grazing allotment and BLM's general duty to require

compliance under the Mineral Leasing Act regulations.   The alleged failure of BLM to require

compliance with a broad range of regulatory requirements, however, fails to satisfy the

requirement for a "discrete agency action."  It is clear from the face of the complaint that

plaintiffs do not challenge a specific instance of nonenforcement, or even a particular series of

such instances.  The complaint describes "types of violations, including but not limited to" ten

categories.  Compl. ¶ 17 (emphasis added).  No dates are provided, and no locations are given,

nor are specific oil and gas operators identified.  The complete absence of such details about any

particular instance of nonenforcement underscores the deficiency in plaintiffs' complaint with

respect to a discrete agency action.

Plaintiffs contend that the failures alleged in the complaint "could be categorized" as the

denial of one of the five categories of agency actions identified in § 551(13) -- that is, the denial

of an order to oil and gas operators to comply with regulations, the denial of a sanction against oil

and gas operators for failing to comply with regulations, or the denial of relief.[5]  Pls. Mem. at 17.

But such a characterization is at odds with the Supreme Court's determination that agency action

as defined in the APA is a "circumscribed, discrete" action.  The failures alleged are neither

_____

[5]  Plaintiffs attempt to characterize the holding of SUWA as limited to land use plans, broad programmatic attacks, or statutory language that closely mirrors the Wilderness Study Act provision reviewed by the Supreme Court.  However, the framework set forth in SUWA expressly applies to all claims of agency inaction.  See SUWA, 542 U.S. at 61, 64 ("We begin by considering what limits the APA places upon judicial review of agency inaction," and conclude that "[t]hus, a claim under § 706(1) [of the APA] can proceed only where a plaintiff asserts that an agency failed to take a discrete agency action that it is required to take.") (emphasis in original).

"circumscribed" nor "discrete" in any manner.  On the contrary, plaintiffs describe a broad range

of "types of violations" that have gone unaddressed, and expressly disavow limiting the complaint

to any single violation or even a single category of violations.  Compl. ¶ 17.  Thus, pinning the

label "denial of order" or "denial of sanction" on the broad allegations of the complaint does

nothing to remedy the deficiency.  See SUWA, 542 U.S. at 65-66 (noting that the label plaintiff

appends to its claim is not dispositive, and suggesting that whether a failure to act is a discrete

agency action is a legal determination to be made by the court).  Indeed, the same conclusory

characterizations could have been attributed to the claims alleged in SUWA, which the Supreme

Court nonetheless concluded did not present a discrete agency action.  Id.  Here, plaintiffs allege

the same sort of general deficiencies in agency oversight alleged in SUWA, and as there,

"[g]eneral deficiencies in compliance . . . lack the specificity requisite for agency action."  Id. at

66.  Accordingly, the Court holds that both of plaintiffs' claims must be dismissed because the

alleged failure to act underlying the claims is not a "discrete agency action" subject to judicial

review.

**C.    Action "Legally Required"**

Even if plaintiffs could overcome this first jurisdictional hurdle, their claims are not

actionable under the APA because they also fail to allege an action that BLM is "legally required"

to take -- the second element required where an agency failure to act is challenged.  SUWA, 542

U.S. at 63-64.  Plaintiffs attempt to characterize § 315b of the Taylor Grazing Act as imposing a

nondiscretionary duty on BLM to "adequately safeguard" grazing privileges, emphasizing the use

of the term "shall."  However, the plain language of § 315b makes clear that the duty to

"adequately safeguard" grazing privileges is subject to balancing against other considerations.

The relevant subsection states in full: "<u>So far as consistent with the purposes and provisions of</u> <u>this subchapter</u>, grazing privileges recognized and acknowledged shall be adequately safeguarded, <u>but</u> the creation of a grazing district or the issuance of a permit <u>shall not create any right, title,</u> <u>interest or estate in or to the lands</u>."  43 U.S.C. § 315b (emphasis added).  In <u>Public Lands</u> <u>Council v. Babbitt</u>, the Supreme Court examined this exact language and concluded that it gave the agency "broad discretionary powers" and thus "at least ordinary administrative leeway to assess 'safeguard[ing]' in terms of the Act's other purposes and provisions."  529 U.S. at 742. Therefore, the Court concludes that there is no "legally required" agency action that can be compelled and thus no basis under the Taylor Grazing Act for plaintiffs' claim of agency action "unlawfully withheld" under § 706 of the APA.

Plaintiffs' reliance on <u>Oman v. United States</u>, 179 F.2d 738, 742 (10th Cir. 1949), as providing precedent for finding a mandatory duty to adequately safeguard grazing privileges is misplaced.  Even assuming that <u>Oman</u> remains viable after <u>SUWA</u> and <u>Public Lands Council</u>, the decision has no persuasive value in the instant setting because other distinct regulatory provisions -- which are lacking here -- were essential to the result.  In <u>Oman</u>, plaintiffs holding grazing privileges brought suit seeking recovery for damages suffered as a result of predecessors to the land who continued to graze on plaintiffs' allotment.  The court addressed whether the government had a nondiscretionary duty within the meaning of the Federal Tort Claims Act to cancel the predecessors' grazing permits and considered that a federal regulation required a specific outcome.  <u>See</u> 179 F.2d at 740-41 & n.2 ("the gist of this aspect of plaintiffs' action is the refusal to cancel the old permits . . . and as to that, the [agency] would appear to have no discretion," quoting then-43 C.F.R. 161.7(a) as providing "[a] transfer of base property * * * will

-13-

entitle the transferee, if otherwise properly qualified, to all or such part of a license or permit as is based on the property transferred, and the original license or permit will be terminated."). That scenario stands in stark contrast to the present case, where no Taylor Grazing Act regulations direct the agency to reach any particular result when grazing privileges and mineral interests are competing with each other. Accordingly, <u>Oman</u> does not support plaintiffs' claim that the "adequately safeguard" provision creates a mandatory duty under § 706(1) of the APA.[6]

Plaintiffs also attempt to characterize the Mineral Leasing Act regulations codified at 43 C.F.R. Part 3160 as imposing a nondiscretionary duty on BLM to require oil and gas operators to comply with all Mineral Leasing Act regulations and ensure that operations do not adversely impact the environment. First, plaintiffs contend that § 3161.2 -- the regulation addressing the "Responsibility of the Authorized Officer" -- imposes a mandatory duty to require compliance from operators because BLM is "authorized and directed" to perform numerous oversight and enforcement activities. The most important, in plaintiffs' view, are the provisions directing BLM "to require [operator] compliance with lease terms, with the regulations in this title, and all other applicable regulations" and "to require that all operations be conducted in a manner which

---

[6] Plaintiffs' last minute attempt in their opposition brief to locate a mandatory duty in § 315a of the Taylor Grazing Act, based on a reference to preservation and protection of the land, fares no better. See Pls. Opp. Mem. at 15-16. Section 315a contains broad discretionary language substantially similar to that found in § 315b: "The Secretary of the Interior shall . . . do any and all things necessary to accomplish the purposes of this subchapter and to insure the objects of such grazing districts, namely, to regulate their occupancy and use, to preserve the land and its resources from destruction or unnecessary injury, [and] to provide for the orderly use, improvement, and development of the range." Plaintiffs fail to explain how this language limits the agency's discretion any more than the "adequately safeguard" provision, and this Court, consistent with <u>Public Lands Council</u>, declines to so read it.

protects other natural resources and the environmental quality [and] protects life and property."[7] For ease of reference, the Court will refer to these two provisions as the compliance clause and environmental protection clause, respectively.   Plaintiffs further contend that the requirements imposed directly on operators in Subpart 3162 also give rise to a BLM enforcement obligation because BLM is charged with enforcing those regulations.[8]   The operator regulations contain substantially similar compliance and environmental protection clauses, which provide, among other things, that operators "shall comply with applicable laws and regulations[,] with the lease

---

[7]   With respect to activities "authorized and directed," § 3161.2 states in full as follows:

> The authorized officer is authorized and directed to approve unitization, communitization, gas storage and other contractual agreements for Federal lands; to assess compensatory royalty; to approve suspensions of operations or production or both; to issue NTL's; to approve and monitor other operator proposals for drilling, development or production of oil or gas; to perform administrative reviews; to impose monetary penalties or assessments; to provide technical information and advice relative to oil and gas development and operations on Federal and Indian lands; to enter into cooperative agreements with States, Federal agencies and Indian tribes relative to oil and gas development and operations; to approve, inspect and regulate the operations that are subject to the regulations in this part; to require compliance with lease terms, with the regulations in this title and all other applicable regulations promulgated under the cited laws; and to require that all operations be conducted in a manner which protects other natural resources and the environmental quality, protects life and property and results in the maximum ultimate recovery of oil and gas with minimum waste and with minimum adverse effect on the ultimate recovery of other mineral resources.

43 C.F.R. § 3161.2 (emphasis added).

[8]   Defendants' attempt to characterize operator duties as irrelevant to the scope of BLM's duties is puzzling in light of the breadth of 43 C.F.R. § 3161.2 charging BLM broadly with requiring operators to comply with all applicable regulations -- including Subpart 3162.

terms, Onshore Oil and Gas Orders, and NTLs [notices to lessees],"[9] that operators "shall conduct operations in a manner which protects the mineral resources, other natural resources, and environmental quality," and that they shall exercise "due care and diligence" to avoid "undue damage to surface or subsurface resources." Id. 43 C.F.R. §§ 3162.1, 3162.5-1.[10]

―――――――――――――――

[9]   A "notice to lessee" is a "written notice issued by the authorized officer" that "implement[s] the regulations in this part [Part 3160] and operating orders and serve[s] as instructions on specific items of importance within a State, District or Area."  43 C.F.R. § 3161.0-5.  Plaintiffs describe NTLs issued by BLM dealing with mortality to wildlife, noise standards, waste disposal, waste in pits, netting, and painting.  Pls. Opp. Mem. at 11.

[10]     The relevant subsections of these regulations state as follows:

§ 3162.1 General Requirements
   (a) The operating rights owner or operator, as appropriate, shall comply with applicable laws and regulations; with the lease terms, Onshore Oil and Gas Orders, NTL's; and with other orders and instructions of the authorized officer.  These include, but are not limited to, conducting all operations in a manner which ensures the proper handling, measurement, disposition, and site security of leasehold production; which protects other natural resources and environmental quality; which protects life and property; and which results in maximum ultimate economic recovery of oil and gas with minimum waste and with minimum adverse effect on ultimate recovery of other mineral resources.

* * *

§ 3162.5-1 Environmental obligations
   (a) The operator shall conduct operations in a manner which protects the mineral resources, other natural resources, and environmental quality.  In that respect, the operator shall comply with the pertinent orders of the authorized officers and other standards and procedures as set forth in the applicable laws, regulations, lease terms and conditions, and the approved drilling plan or subsequent operations plan. . . . .
   (b) The operator shall exercise due care and diligence to assure that leasehold operations do not result in undue damage to surface or subsurface resources or surface improvements.

43 C.F.R. §§ 3162.1, 3162.5-1.

Defendants acknowledge that the regulations charge BLM with requiring operator compliance with lease terms and regulations and with requiring that operations be conducted in a manner that protects environmental quality.  They contend, however, that plaintiffs' interpretation is unreasonable because it relies entirely on the word "directed" in § 3161.2, without looking at the context of the regulation in Part 3160.  Defendants contend that, like the nonimpairment mandate in SUWA, the BLM regulations are only "mandatory as to the object to be achieved, but ... leave[] BLM a great deal of discretion in deciding how to achieve it."  SUWA, 542 U.S. at 2380.

It is plain that the environmental protection clause, like the nonimpairment mandate in SUWA, sets forth only a broad objective to be achieved -- the conduct of operations "in a manner which protects natural resources and environmental quality" and "protects life and property."  This clause -- and the substantially similar clauses in §§ 3161.2(a) and 3162.5-1 -- lack the specificity and clarity necessary to support judicial action under § 706(1).[11]  As defendants point out, "environmental quality" is not defined in the Mineral Leasing Act or its regulations and thus BLM must exercise discretion in determining which operations adversely impact "environmental quality."  Moreover, a regulatory charge to take action "in a manner" that protects one interest or another, or to avoid "undue damage," can hardly be said to instruct an agency to take any specific action.   The term "manner" means only "a way of acting or performing," and the term "undue" means "improper," "excessive,"or "disproportionate," suggesting that some undefined amount of

---

[11]  Section 3161.2 enumerates no fewer than a dozen comprehensive functions to be performed by BLM.  Such an exhaustive list, under the heading "Responsibility of the authorized officer," further suggests that this provision was not intended to create mandatory duties but instead was to establish the jurisdiction of the officer to act.

damage is acceptable.  Webster's Third New International Dictionary (1993).  Furthermore, the

same regulation that provides that BLM is "authorized and directed" to ensure protection of

environmental quality states in the very next breath that BLM is also "to require that operations

be conducted in a manner . . . which results in the maximum ultimate recovery of oil and gas with

minimum waste and with minimum adverse effect on the ultimate recovery of other mineral

resources."  43 C.F.R. § 3161.2.  This identical obligation is imposed directly on operators in

§ 3162.1(a).  Thus, examining the regulatory text omitted by plaintiffs, it becomes quite clear that

BLM is charged with protecting competing interests -- including maximizing recovery of mineral

resources -- which inherently calls for the exercise of discretion.  In light of the discretion the

regulations accord to BLM in ensuring that operations are conducted "in a manner" that protects

the competing interests enumerated, the Court concludes that the environmental protection clause

of § 3161.2  -- and the comparable clauses in Subpart 3162 -- are devoid of a specific mandate

with which the Court may require compliance.[12]

   Defendants contend that they have equally broad discretion in determining how to obtain

compliance with lease terms and regulations consistent with the compliance clause in § 3161.2.

---

[12] Contrary to plaintiffs' contention, Center for Biological Diversity v. Veneman, 394 F.3d
1108 (9th Cir. 2005), does not suggest a different result.  The Ninth Circuit applied the SUWA
framework and affirmed the dismissal of a complaint challenging an agency's failure to consider
57 rivers while planning for land use and development because the action challenged under the
Wild and Scenic Rivers Act was not sufficiently specific and nondiscretionary. Id. at 1109, 1113
(rejecting plaintiff's challenge to agency failure to comply with mandate under 16 U.S.C.
§ 1176(d)(1) that "consideration shall be given by all Federal agencies to potential national wild,
scenic, and recreational river areas" ).  The court's separate determination that plaintiffs should
have been granted leave to amend the complaint to allege more specific failures to act under this
and other statutory provisions was not a determination on the merits that such amendments had a
likelihood of success, but rather reflected the liberal standard for amendments to pleadings under
Fed. R. Civ. P. 15(a).  See 394 F.3d at 1114.

Although lease terms and regulations are likely more specific than a general mandate to "protect environmental quality," defendants contend that it is still unreasonable to construe § 3161.2 to impose a mandatory duty on BLM in all instances of noncompliance, in light of other provisions that grant BLM discretion in obtaining compliance.  Defendants first point to a separate provision that requires inspections only "once annually," even for operators with a history of noncompliance.  See 43 C.F.R. § 3161.3.   Defendants also place heavy reliance on the broad discretion accorded to BLM in deciding how to handle violations by operators under the regulations governing enforcement in Subpart 3163.  First, the regulations contemplate that the agency will attempt to secure voluntary compliance by the operator before bringing formal enforcement action.  For example, the agency establishes a "reasonable abatement period" pursuant to § 3163.1(a) when notices of violations are issued.  If the violation is not corrected within the allotted time, the agency generally has discretion in deciding whether to impose a monetary penalty and, if so, the amount of the penalty.   Id. § 3163.1(a)(1)-(2) (BLM "may subject the [operator] . . . to an assessment of not more than $500 per day" for a major violation, or it "may subject the [operator] . . . to an assessment of $250" in the case of a minor violation.) (emphasis added).  The regulation also provides that BLM "may" pursue other forms of relief "when necessary for compliance," including shutting down operations, entering upon a lease and performing operations, and cancelling the lease.  See id. § 3163.1(a)(3)-(5).  BLM characterizes these regulations as setting forth administrative procedures for the agency to follow in the event that it exercises it discretion to go forward with formal enforcement action and to advise operators of the procedures they will be subject to in such an event.

It bears noting that the regulations mandate an "immediate" assessment of penalties in three categories of egregious violations. These are: (1) failure to install a blowout preventer or other equivalent well control equipment; (2) failure to obtain the necessary approvals prior to drilling activities; and (3) failure to obtain approval of a plan for well abandonment prior to commencement of such operations. 43 C.F.R. § 3163.1(b). At first glance, this might seem to cast doubt on defendants' position that it has broad discretion in determining how to require compliance with its regulations and leases, since any discretion is narrowly circumscribed for these three types of violations. See 52 Fed. Reg. 5384, 5387 (Feb. 20, 1987) (preamble to final rule discussing automatic nature of assessment upon discovery). But plaintiffs do not allege any violations falling into these categories, and at the motions hearing conceded that they were not aware of any. Indeed, no one could dispute that the ten categories of violations plaintiffs have alleged -- involving matters such as weeds, trash, noise, and lack of seeding and fencing -- pale in comparison to the more egregious violations subject to immediate penalties, such as drilling without approval and unauthorized well abandonment. More significantly, the preamble to the final rules creating this enforcement scheme explains that, at an earlier stage, BLM had contemplated creating a broader mandatory and immediate assessment scheme -- that is, where multiple major violations occurred -- but declined to finalize that approach, concluding instead that "the Bureau agrees that each violation should be handled on its own merits and that the imposition of an automatic assessment, other than for those specific violations discussed above, is not appropriate." 52 Fed. Reg. at 5387.

Thus, with the exception of these three enumerated, and limited, categories, the Court agrees that BLM has broad discretion in determining how it may pursue enforcement as to

violations.  Not only do the regulations give BLM broad discretion to grant reasonable abatement periods to allow for self-compliance and possible imposition of penalties, but the preamble makes clear that each violation "should be handled on its own merits" without a scheme of mandatory assessments.

Plaintiffs nonetheless argue that, although BLM has discretion in obtaining voluntary compliance and setting penalties, the threshold act of initiating enforcement proceedings -- the issuance of a notice of violation -- is not discretionary.  In support of this argument, plaintiffs rely on language in § 3163.1(a), providing that "[w]henever an operating rights owner or operator fails or refuses to comply with the regulations in this part, the terms of any lease or permit, or the requirements of any notice or order, the authorized officer shall notify the operating rights owner or operator, as appropriate, in writing of the violation or default."  However, it is widely recognized that use of the term "shall" is not conclusive.  "Particularly when used in a statute that prospectively affects government action, 'shall' is sometimes the equivalent of 'may'," and "[t]he question whether 'shall' commands or merely authorizes is determined by the objectives of the statute," which requires looking also at its structure and legislative history.  Sierra Club v. Whitman, 268 F.3d 898, 904 (9th Cir. 2001).

Here, the Court concludes that the enforcement scheme created by Subpart 3163 weighs heavily against construing "shall" as creating a mandatory duty because the objective is extraordinarily broad -- obtaining operator compliance with all BLM regulations and leases.   The breadth of this objective is apparent from the facts alleged by plaintiffs as to their allotment alone -- over 400 wells on 32,000 acres are subject to BLM's oversight, including 11,040 acres leased to pipelines and 800 miles of roads.  Compl. ¶ 13; Pls. Opp. Mem. at 2.  Recognizing that law

enforcement officers may choose not to pursue each and every violation of the law because of competing considerations, the Supreme Court recently has declined to interpret "shall" as imposing a mandatory duty to take enforcement action in the context of determining when citizens have an entitlement to enforcement under the due process clause.  Town of Castle Rock v. Gonzales, 125 S. Ct. 2796, 2806 (2005).   The Court reaffirmed "the deep-rooted nature of law-enforcement discretion even in the presence of seemingly mandatory legislative commands," and recognized that those charged with enforcing the law "must use some discretion in deciding when and where to enforce."  Id.   Moreover, Heckler v. Chaney, 470 U.S. 821, 835 (1985) instructs that when "shall" is used in a enforcement provision, it should be construed to confer discretion on an agency unless the statute or regulations provide substantive standards that constrain the exercise of discretion.[13]  Id. (holding that statute providing that violators "shall be imprisoned . . .

_____

[13]  Heckler v. Chaney indicates that plaintiffs' lawsuit also should be dismissed because it challenges the agency's failure to take enforcement action -- a category of actions that are presumptively unreviewable under § 701(a)(2) of the APA, which precludes judicial review when "agency action is committed to agency discretion by law." 470 U.S. at 831.  Although the presumption may be overcome where the substantive statute or regulation provides guidelines for the agency to follow in exercising its enforcement authority (id. at 832-33), the Court is doubtful that plaintiffs could overcome the presumption in this case. The Supreme Court explained that a statute, or presumably a binding regulation, could set guidelines sufficient to rebut the presumption of unreviewability "either by setting substantive priorities, or by otherwise circumscribing an agency's power to discriminate among issues or cases it will pursue." 470 U.S. at 833.   The Taylor Grazing Act provisions and BLM regulations relied upon by plaintiff do not appear to set forth such enforcement priorities or instruct the agency how to discriminate among cases, aside from the three categories of the most egregious and obvious violations enumerated in 43 C.F.R. § 3163.1(b).  Nor would a lease appear to be a viable source of guidelines constraining the agency's enforcement discretion because, as a contract between the agency and a private party, it is not the equivalent of a statute or regulation that creates federal law applicable by a court.  See Matthews v. Town of Greenville, 1991 WL 71414, *3 (6th Cir. 1991) (unpublished decision) (rejecting petitioner's contention that contract between federal agency and private party may supply "law to apply," and limiting inquiry to standards set forth in the substantive statute at issue). However, in light of the Court's dismissal of plaintiffs' claims on other grounds, the Court need not decide whether § 701(a)(2) also precludes judicial review.

or fined" did not mandate prosecution); see Dubois v. Thomas, 820 F.2d 943, 948-49 (8th Cir. 1987) (deferring to agency interpretation that "shall" should be construed to confer discretion); City of Yakima v. Surface Transp. Bd., 46 F. Supp. 2d 1092, 1099-1100 (E.D. Wash. 1999) (same).  Finally, the regulations instruct BLM to issue the threshold notice of violation "whenever" a violation occurs.  Other courts have held that use of the term "whenever" in similar enforcement contexts may reasonably be construed to indicate discretion because, among other things, the agency must make a judgment as to whether a violation has occurred.  See, e.g., Her Majesty the Queen in Right of Ontario v. EPA, 912 F.2d 1525, 1533 (D.C. Cir. 1990); New York Public Interest Research Group v. Whitman, 321 F.3d 316, 330-31 (2d Cir. 2003).

        The Court notes two other relevant factors in determining the meaning of "shall" in § 3163.1(a).  First, the regulatory history of the final rule supports BLM's position that the regulation grants it discretion in how to handle violations.  As discussed above, the preamble is explicit that, with the exception of the three categories of violations enumerated under § 3163(b), BLM intended the regulation to allow for the exercise of discretion.  See 52 Fed. Reg. at 5387.  Second, substantial deference is due an agency's interpretation of an ambiguous regulation.  Thomas Jefferson Univ. v. Shalala, 512 U.S. 504, 512 (1994).  Considering the wording and history of § 3163.1(a), and the principles that apply when construing enforcement provisions, the Court concludes that § 3163.1(a) does not create a mandatory duty to issue notices of violations to all operators who are in violation of regulations, lease terms, or orders.

        In sum, none of the regulations in Part 3160 imposes a mandatory duty on BLM to protect the environment with the specificity required to support a claim under § 706(1) of the APA, nor do the regulations create a mandatory duty to pursue enforcement actions against operators for the types of violations alleged in the complaint.  Absent a mandatory duty to take specific action,

plaintiffs' claim seeking relief for BLM's alleged failures to act is not remediable under the APA.

One need only look at the relief requested in plaintiffs' complaint to see that it calls for the very

type of broad and open-ended judicial order that, as explained in SUWA, the APA was not

designed to encompass.  Specifically, plaintiffs seek a broad judicial order "requiring the BLM to

comply with the Taylor Grazing Act by adequately safeguarding the Plaintiffs' allotment," to

force operators "to comply with BLM regulations," and to "take action against such violators as

provided by statute and regulation."  Compl. ¶ 45.  The precise actions that BLM would be

required to undertake to satisfy such a judicial order would be extremely difficult to determine,

and ultimately would require the Court to set the priorities of the agency as to various alleged

violations and environmental harms.  Yet the APA's limited provisions, and the limitation upon

mandamus from which they were derived, as the Supreme Court has observed, serve the

important purposes of protecting agencies from undue judicial interference with their lawful

discretion and avoiding this very type of judicial entanglement in areas beyond the expertise of

the federal courts:

> If courts were empowered to enter general orders compelling
> compliance with broad statutory mandates, they would necessarily
> be empowered, as well, to determine whether compliance was
> achieved -- which would mean that it would ultimately become the
> task of the supervising court, rather than the agency, to work out
> compliance with the broad statutory mandate, injecting the judge
> into day-to-day agency management.

SUWA, 542 U.S. at 66-67.  To be sure, in a reviewable challenge to a discrete final agency

action, judicial intervention may legitimately have the effect of requiring "even a whole 'program'

to be revised by the agency in order to avoid the unlawful result that the court discerns."  Lujan v.

National Wildlife Fed'n, 497 U.S. 871, 894 (1990).  However, in the absence of a discrete action

that the agency is legally required to take, the Court may not proceed down that path.

## CONCLUSION

For these reasons, the Court will grant defendants' motions for judgment on the pleadings and dismiss the case for lack of subject matter jurisdiction.  Plaintiffs request that, in the event of dismissal, the Court dismiss the claims without prejudice.  Because the Court has determined that it lacks jurisdiction, dismissal without prejudice is appropriate.  See Kirkham, 429 F.3d at 291 (noting that, absent jurisdiction, a court cannot render a decision on the merits).  A separate order has been issued on this date.

_____/s/_____
JOHN D. BATES
United States District Judge

Dated:   March 20, 2006


Copies to:

Karen Jean Budd-Falen
BUDD-FALEN LAW OFFICE
P.O. Box 346
300 East 18th St.
Cheyenne, WY 820001-4614
Email:  karen@buddfalen.com
        *Counsel for plaintiffs*

John S. Most
U.S. DEPARTMENT OF JUSTICE
P.O. Box 663
Washington, DC 20044-0663
Email:  john.most@usdoj.gov
        *Counsel for defendants*

Charles L. Kaiser
DAVIS, GRAHAM & STUBBS, LLP
1550 17th St., NW, Suite 500
Denver, CO 80202-0185
Email:  chuck.kaiser@dgslaw.com
        *Counsel for intervenor-defendant New Mexico Oil and Gas Ass'n*